UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60136-CR-RUIZ

UNITED STATES OF AMERICA,

vs.

JEFFREY CLARK WARREN,

Defendant.
_____/

## FACTUAL PROFFER

The United States of America and Jeffrey Clark Warren ("WARREN"), agree that had this case proceeded to trial, the United States would have proven beyond a reasonable doubt the following facts, among others, establishing violations of Title 21, United States Code, Section 841(a)(1), which occurred in the Southern District of Florida:

In or about January 2020, a confidential informant ("CI") acting at the direction of law enforcement was engaged in purchases of methamphetamine from an individual identified as J.G. On January 29, 2020, J.G. was meeting with the CI to discuss a drug transaction, with the goal of introducing an undercover law enforcement officer ("UC") as a fellow purchaser of methamphetamine. During the meeting, J.G. told the CI that his phone battery had died. J.G. asked to use the CI's cellphone to make a call. The CI overheard J.G. call 561-788-3558 and speak with "Jeff." J.G. asked if Jeff would have an ounce of methamphetamine available for him later that afternoon. J.G. ended the call and said he would be ready to sell methamphetamine to the CI later in the day.

At approximately 12:41 p.m., Jeff called the CI's phone to speak with J.G. Jeff indicated that he would have the CI and J.G. meet him in a plaza near his residence. Jeff advised the CI to

have J.G. call him if the CI saw J.G. again. Based on the phone number and address provided by Jeff, law enforcement identified Jeff as Jeffrey Clark WARREN ("WARREN"). Prior law enforcement reports showed WARREN to be the occupant of 381 SE 15th Avenue, Apt. 5, Deerfield Beach.

At approximately 2:13 p.m., WARREN called the CI to say he was still waiting to hear from J.G., and that he only had a half-ounce of methamphetamine still available. WARREN said he was still waiting on his source of supply, but that could take anywhere from 10 minutes to a day. At approximately 2:25 p.m., J.G. called the CI to say that he was on his way to WARREN's house. J.G. said he had an ounce of methamphetamine that he would sell for $1,100.

At approximately 2:51 p.m., at the direction of the UC, the CI called WARREN to discuss the transaction. In this recorded call, WARREN confirmed he still had only one-half ounce of methamphetamine and that he was not sure what J.G. was trying to pull by claiming to have a full ounce. WARREN told the CI to cut J.G. out of the transaction and deal only with WARREN. WARREN said he would sell the half ounce for $300.

At approximately 3:00 p.m., law enforcement met to plan surveillance for the buy. At this time, WARREN called the CI again and attempted to increase the price. The CI said they could discuss the price when they met in person. WARREN told the CI to meet at his (WARREN's) residence at 381 SE 15th Avenue, Apartment 5, in Deerfield Beach.

At approximately 3:20 p.m., the CI and the UC met at the parking lot of WARREN's residence. The CI was given $750 and exited the UC's car to walk towards WARREN's apartment complex. The CI then entered the apartment and met with WARREN. WARREN and the CI agreed to a price of $350 for the half ounce of methamphetamine. The CI gave the money to WARREN and WARREN provided a clear plastic bag of suspected methamphetamine.

WARREN suggested that the CI tell the UC that the price was higher, so the CI could pocket the difference. As the CI was leaving, WARREN asked to put the CI's phone number into WARREN's phone and then called the CI. WARREN advised the CI to use the name Kano as the contact name for WARREN's phone number. The CI left the apartment and returned to the UC. The drugs were tested by a lab used by law enforcement and determined to be 16.41 grams of 99% pure methamphetamine.

Between February 4, 2020 and February 6, 2020, the CI placed recorded calls with WARREN to discuss a transaction for 2 ounces of methamphetamine for $1,500. On February 6, 2020, WARREN agreed to meet with the UC alone, without the CI present, to conduct the transaction. WARREN advised the UC to meet at WARREN's residence.

At approximately 5:41 p.m., the UC called WARREN to say he was arriving in the parking lot of the apartment complex. WARREN told the UC where to park and agreed to come down to meet the UC. At approximately 5:46 p.m., WARREN left his apartment and walked directly to the UC's vehicle. WARREN entered the front passenger seat, introduced himself, and provided the UC with two clear plastic bags containing suspected methamphetamine. The UC provided WARREN with $1,500.00 and advised him to count the money while the UC weighed the drugs. The scale malfunctioned and the UC asked if he could borrow one from WARREN. WARREN said he would have to get one from his apartment. WARREN also said he would go back to his apartment and get "another chunk" of methamphetamine for the UC. Law enforcement observed WARREN leave the UC vehicle and go directly back to his apartment. A few minutes later, WARREN exited and walked directly back to the UC's vehicle. WARREN handed the UC an additional small clear bag containing suspected methamphetamine.

While WARREN was in the apartment, the UC was able to get his scale to work and

determined that the original bag weighed 29.3 grams, and thus did not need to be supplemented, but WARREN let the UC keep the small bag. WARREN and the UC discussed future transactions for larger quantities, and WARREN advised that he had local sources as well as sources in Los Angeles. WARREN said he was ordering 2 pounds of methamphetamine from a source in California, and that the price he paid was between $2,000 and $4,000 per pound. WARREN offered to sell a pound of methamphetamine to the UC for $5,000. The UC left. The drugs were submitted to a drug lab and determined to be 56.9 grams of 99% pure methamphetamine.

Between February 6, 2020 and February 11, 2020, the UC kept in touch with WARREN via recorded phone and text messages. In these communications, WARREN said he had ordered several pounds of methamphetamine and was planning to sell one pound to the UC. WARREN asked the UC to meet him on February 11, 2020, but that day, WARREN advised that the drugs had not yet been delivered from California. At approximately 7:43 p.m., WARREN advised the drugs had arrived and he could meet the UC the following day.

On February 12, 2020, at approximately 10:52 a.m., the UC called WARREN to say he was approximately 15 minutes away from the arranged meeting place – a Publix in Deerfield Beach. WARREN said to meet near the Jerry's Artarama, at 242 S. Federal Highway, in the Publix plaza. At approximately 11:07 a.m., the UC called WARREN to say he had arrived at the parking lot. WARREN said he was inside the art supply store and told the UC to pick him up. At approximately 11:16 a.m., WARREN entered the UC's front passenger seat carrying a black backpack and a brown paper bag, which appeared to contain art supplies. The UC parked his vehicle in the parking lot.

Once they parked, WARREN described the difficulties that had delayed the delivery, and then retrieved a small red bag from his backpack. WARREN then removed a clear plastic bag

with the suspected pound of methamphetamine and handed it to the UC. The UC inspected it, discussed the weight, and handed the package back to WARREN. WARREN put the package back inside the red bag and gave the red bag to the UC. The UC discussed the price with WARREN, and ultimately agreed to pay WARREN $5,500 for the pound. After some additional discussion about methamphetamine distribution, WARREN exited the vehicle and the UC left. The drugs were submitted to a drug lab and determined to be approximately 439.8 grams of 92% pure methamphetamine.

On January 9, 2021, a Broward Sheriff's Office (BSO) deputy responded to the Publix parking lot at 1003 E. Commercial Blvd. in Oakland Park. The deputy found three individuals passed out in a car in the parking lot, one of whom was WARREN in the right rear passenger seat. Next to WARREN the deputy found a black/silver container. Inside the container the deputy found suspected methamphetamine, along with 2 metal spoons with burnt residue and several syringes. Also near WARREN were several used syringes around a gray/black book bag containing an electronic scale, empty pill capsules and small zip lock baggies. Post-*Miranda*, WARREN admitted the book bag was his.

The driver of the car told police that he was giving a ride to WARREN, and that WARREN had additional personal possessions in the trunk. Inside the trunk was a red suitcase, which WARREN admitted belonged to him post-*Miranda*. Inside the red suitcase were additional used needles and a small gray bag containing two clear bags with suspected methamphetamine, as well as additional unidentified pills and powders. Subsequent drug testing of the substances determined that 2 pills were Ecstasy, 2.5 grams were cocaine, 241.5 grams were crystal methamphetamine, and there was .5 ounces of liquid methamphetamine.

The parties agree that these facts are sufficient to prove the elements of Title 21, United States Code, Section 841(a)(1).

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 11/10/2021   By: _____
JAMES USTYNOSKI
ASSISTANT UNITED STATES ATTORNEY

Date: 11/9/21   By: _____
DOUGLAS RUDMAN
COUNSEL FOR DEFENDANT

Date: 11-9-21   By: _____
JEFFREY CLARK WARREN
DEFENDANT